DOWNTON *v.* ALLIS.

*(Circuit Court, E. D. Wisconsin.   October Term, 1881.)*

1. LETTERS PATENT—MIDDLINGS FLOUR.

Under certain contracts to which Robert L. Downton and Edward P. Allis & Co. were parties, the latter acquired no rights of ownership in an invention covered by patent No. 162,157, for a process in crushing grain or middlings.

In Equity.

*W. G. Rainey,* for complainant.

*D. S. Wegg* and *Jenkins, Elliott & Winkler,* for defendant.

DYER, D. J., *(orally.)*   This is a bill filed by the complainant, Downton, against the defendant, Allis, the prayer of which, in brief, is that certain contracts, which are set forth *in extenso* in the bill, and to which reference will be presently made, may be decreed to be cancelled, and to be no longer in force; and particularly that it may be

adjudged that the defendant acquired, under said contracts, no rights of ownership in a certain invention covered by patent No. 162,157, for a process in crushing grain or middlings.

The bill was answered in detail, and the defendant therein also filed a cross-bill against Downton in which he asked affirmative relief upon the grounds substantially set forth in his answer to the original bill. To the cross-bill there was an answer.

A suit was also brought in this court by Allis against Stephen H. Seamans and Catherine Stephens, in which Allis alleged that he was the owner of this process patent, and that the invention covered thereby was being wrongfully used by Seamans; and the object of that action is to enjoin the defendants therein from the alleged infringement of the patent. To this bill a plea was filed, in which it was alleged that Downton had never conveyed or transferred to Allis his right and title in and to the patent, and that the right to use, and to license to others to be used, the patented invention, still remained in Downton. As these several causes involve the same controversy—which is the ownership of the process patent—by arrangement between counsel they have been heard together, and upon the proofs applicable to the several causes they are now to be simultaneously decided.

It appears from the evidence that in January, 1876, Downton and Allis, as the result of preliminary negotiations which had been for some time pending between them, entered into certain written contracts, one of which may be designated as the middlings-duster contract, the other as the process-patent contract, and the other as the personal-service contract. By the first of these instruments, in the order in which they have been enumerated, it was provided as follows:

"For and in consideration of the sum of $125, to me in hand paid, I do hereby sell, assign, and set over to Edward P. Allis & Co., of Milwaukee, Wisconsin, their successors, and assigns, the exclusive right to manufacture and sell a certain machine, for which I agree to obtain a patent, to be known as 'Downton's peerless middlings duster,' for the full term of the patent, or any improvement or extension thereon. And upon the obtaining of said patent I hereby agree to execute such assignment.

"*Dated at Milwaukee, Wisconsin, this twenty-fourth day of January, A. D.* 1876.

[Signed]                                    "ROBERT L. DOWNTON."

The instrument relating to the process patent is as follows:

"For and in consideration of the sum $125, to me in hand paid, I hereby sell, assign, and set over to Edward P. Allis & Co., of Milwaukee, Wisconsin, their successors and assigns, the exclusive right to manufacture and sell rolls for crushing grain or middlings, or other substances, which right or process is secured to me under patent numbered 162,157, dated April 20, 1875, for the full life of such patent and reissues, extensions or improvements thereon, except that the shop right to manufacture and sell in the state of Minnesota, but not elsewhere, is granted to O. A. Pray, of Minneapolis; said Allis & Co. having an equal right to sell in said state.

"*Dated at Milwaukee, Wisconsin, this twenty-fourth day of January, A. D.* 1876.

[Signed]                                            "ROBERT L. DOWNTON."

In the third agreement, known as the personal-service contract, it was recited that by certain agreements (referring to the contracts last mentioned) the right to the exclusive manufacture of Downton's peerless middlings duster and rolls, for crushing grain, had been conveyed by Downton to Allis & Co., and it was agreed that Downton should enter into their employment and engage in the sale of these machines and other manufactures of Allis & Co.; that he should be paid for his services at the rate of $1,500 per year, and that upon all sales Allis & Co. were to receive certain profits, which it is not necessary to speak of more particularly. It was also provided by this contract that the engagement of Downton to Allis & Co., at the rate of $1,500 per year, might be ended upon notice of six months by either party, or without notice upon the payment of $750 in money. This contract is dated January 3, 1876. At the time of the execution of these several contracts, or soon thereafter,—and it is a close question of fact at what precise date the transaction between the parties occurred—an *addendum* was put to the personal-service contract, which provided that "in case of the termination of the above arrangement, by death or other casualty, the right to sell the machines referred to in the above agreement shall revert to the heirs or successors of R. L. Downton, the manufacture continuing in said Allis & Co., to whom all orders are to be sent." This *addendum* was signed by both of the parties.

As I have indicated, the question here involved is whether, under these contracts, or either of them, the defendant Allis acquired the title to the patent in question, which, if valid, is alleged to be of very great value. It is worthy of remark that these causes have been very thoroughly presented on both sides, and every point that can possibly support the conflicting theories of counsel has been forcibly

urged upon the attention of the court; and the court has endeavored to give to the cases the consideration which their importance requires.

Among other things, it is claimed in behalf of the complainant that he was led to enter into the arrangements evidenced by the contracts referred to, by false and fraudulent representations on the part of Allis, with reference particularly to the latter's capacity to manufacture the rolls mentioned in the process-patent contract; and with reference also to his pecuniary ability to engage in and carry forward such manufacture. Without adverting to the testimony bearing upon this question, in detail, it is enough to say that it does not support this claim.

It has been contended also by counsel for the complainant that in the case of *Downton* v. *Yaeger Milling Co.* 9 FED. REP. 402, decided by Judge Dillon, this process-patent contract was construed; and that the relations of Allis to that litigation were such that the construction there put upon the contract should be held *res adjudicata* here. I differ from counsel upon that point; that is to say, I do not think that the relations of Allis to that controversy were such as to make the decision in that case binding upon him. At the same time, I concur in the construction which Judge Dillon put upon this contract in the case cited. In other words, I am of the opinion that under a fair and proper construction of that instrument the right and title to the process-patent did not pass to Allis.

In considering this question, we have to bear in mind that there is a plain distinction to be taken between the process which was patented and the mechanism to be necessarily made and operated in the use of the process. The thing that was patented to Downton was not the right to make rolls for crushing grain or middlings; it was not the right to make a particular form of mechanism by which this thing could be done; because, so far as the record here shows, anybody would have the right to make rolls or to make the mechanical implements by which the process might be used. It was the process itself that was patented, and that invention, I think, was not transferred to Allis & Co. by the contract in question, nor by all the contracts which have been referred to, when combined or considered together. By referring to the patent we find that what the patentee claims as new, is "the herein described process of manufacturing middlings flour by passing the middlings, after their discharge from

the purifier, through or between rolls, and subsequently bolting and grinding the same for the purposes set forth."

Now, it will be observed that the language of the process-patent contract, before quoted, is this: "For and in consideration of the sum of $125, to me in hand paid, I hereby sell, assign, and set over to Edward P. Allis & Co., of Milwaukee, Wisconsin, the exclusive right to manufacture and sell rolls for crushing grain or middlings or other substances."

In *Downton* v. *Yaeger Milling Co. supra,* the defendant set up this contract as an assignment to Allis & Co. of all of Downton's rights; and upon that question Judge Dillon, in his opinion, says that in order to enable the milling company to avail themselves of this contract as such an assignment—

"It must appear on its face to be a complete assignment of Downton's rights; if not, he can maintain this suit if not otherwise equitably estopped. Now, did he by this instrument assign his rights under the process patent? He says: 'I grant to them the exclusive right to manufacture and sell rolls for crushing grain or middlings or other substances, * * * which right or process to manufacture and sell rolls is secured to me by said patent.' This seems to be based on a mistake from the beginning to the end. It is said, however, by the defendants, that he meant to convey something, and you must put a construction on it so as not to defeat the operation of the instrument; but my judgment is, since this does not operate intrinsically or *ex proprio vigore* as an assignment by Downton of his rights under that patent, they remain in him, and will remain in him as against Allis & Co., until Allis & Co. shall secure by the decree of a court in equity, if thereto entitled, a specific execution of an assignment of the process to them."

This is unquestionably a correct construction of the contract. If, then, it be determined that this instrument on its face does not convey the title to this patent to Allis & Co., the question properly arises in this suit, wherein Allis & Co. are seeking in effect the decree for a specific execution of an assignment of the patent to them, did the parties to this contract intend to convey the absolute ownership of the patent to Allis & Co.? And clearly the burden of showing that such was the intent of both the parties to the contract is cast upon the defendant Allis.

Upon consideration of the testimony I am not prepared to say that it was not at the time thought by Allis that he was acquiring an interest in the patent; but I think it is quite clear, in the light of all the testimony, and all the circumstances under which these various contracts were executed, that it was not so understood by Downton,

and of course if the contract does not in terms carry the patent, or, convey all of Downton's rights under the patent, then it must be made to appear, in order to sustain the claim of Allis, that it was nevertheless the intent of both the parties that the title should be conveyed by that contract.

It is true that this agreement giving the right to manufacture and sell rolls for crushing grain or middlings excepts from its operation the shop right to manufacture and sell in the state of Minnesota, which was granted to O. A. Pray, of Minneapolis. And it must be admitted that this exception, thus expressed, is a circumstance which sustains the construction put upon this contract by counsel for Allis, namely, that it was the intention of both the parties that Downton's entire right under the patent should pass, since the evidence shows that a right to sell the process in the state of Minnesota was transferred by Downton to Pray, and was excepted in the contract with Allis & Co. But that fact or circumstance, I think, is not powerful enough to outweigh other circumstances in the case which lead my mind to the conclusion that Downton did not understand that he was transferring absolutely to Allis all his right and title to the patent at the time he made this contract; and those circumstances are not, I think, overcome by the proofs offered on the part of Allis.

It is in evidence that the parties to this contract, soon after they began their joint operations, prepared a circular, the authorship of part of which Allis admits. In another part of this circular, prepared by Downton, he declares substantially that he is the owner of the patent, and that all licenses to use the process must emanate from him. The court does not overlook the fact that Allis testifies that he did not at the time know that Downton had made such a statement in this circular. Nevertheless, it was a document that emanated from the offices of Allis & Co., and was put in circulation; and I think, under all the circumstances of the case, the circular must be regarded as having been jointly produced by the parties and published by them, so that both became equally affected thereby. Then there is a further fact in the case, that Leggett & Co., attorneys in Cleveland, Ohio, at one time made a demand upon Allis & Co. of payment for services rendered in preparing an opinion upon the validity of this patent; and in the communication which Allis & Co. made in response to this document they declined to make payment, upon the ground that they were not the owners of the patent. In this connection it should be said that Allis testifies that he was not personally informed that such a communication had been sent to

Leggett & Co. But it is, nevertheless, true that it was written in his office, and forwarded therefrom by one of his responsible subordinates; and afterwards, as it appears, the item of $50, which Leggett & Co. had charged for their opinion upon the validity of the patent, was placed upon the debit side of an account prepared by Allis & Co., and was therein made a charge against Downton. Attempt has been made by reference to certain other entries which precede that, to show that the entry in question really meant a charge for advertising the opinion of Leggett & Co.; but I do not find any testimony in the case which shows that the opinion was ever advertised; and the amount of the item, as it appears in the account rendered to Downton, is precisely the same as the amount of the bill which Leggett & Co. rendered to Allis & Co.

The business relations between Allis & Co. and Downton appear to have continued to 1877, and it was not until that time that Allis asserted the right and title to the patent which he is now seeking to enforce in this litigation; and it may be generally remarked that from the time this contract of January 24, 1876, was made, until Downton left the service of Allis & Co., and until their business relations were terminated, this patent was treated as belonging to Downton, and it was not until difficulties arose between the parties, so far as the court is able to discover, that the claim now made by Allis was asserted. By these observations the court does not mean to say that during all this period that passed between the execution of the contract and 1877, Allis may not have thought that he had a claim upon the patent. But even if that be so, that is not sufficient, in view of the construction which the court is constrained to place upon this contract, to give to Allis the rights which he is now insisting upon. It must satisfactorily appear that both the parties understood and intended that all the rights under the process-patent, originally vested in Downton, should absolutely and forever pass to Allis.

It is to be observed also, that, as shown by the testimony, at one time, Allis said to complainant's solicitor that he understood his rights under this contract to be those of a mere licensee, and he did not then claim that he was the actual owner of the patent.

It is true, there is the testimony of one witness to the effect that Downton said he had parted with the patent. And another witness has testified to a remark which he says Downton made, and which, if made, was to some extent an admission by Downton that he had transferred the patent to Allis. But, considering the case comprehensively and in all its bearings, and in the light of all the circum-

stances which have been developed, my judgment is that it is not shown by the weight of the evidence that Downton intended to convey, absolutely, his right and title in and to this patent; and that he did not understand that he was making such an instrument of absolute conveyance. I must, therefore, hold that the title still remains in the plaintiff, Downton.

I have not undertaken to construe what has been spoken of as the *addendum* to the personal-service contract. Much was said in argument concerning its meaning and proper construction. In the view now taken of the case that part of the discussion becomes quite immaterial, and in disposing of the questions which it is here necessary to decide, I have only taken that *addendum* into consideration as a transaction between the parties which tends to strengthen Downton's claim that he did not intend to make an absolute conveyance of this patent to Allis & Co.

The complainant will have a decree as prayed in the original bill. The cross-bill will be dismissed, and the plea to the bill in the case of Allis against Seamans and others will be sustained.